```
                    UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF WASHINGTON
                             AT TACOMA


MOTHER, LLC,                   )        Docket No. C06-5540JKA
                               )
              Plaintiff,       )        Tacoma, Washington
                               )        September 18, 2007
       v.                      )
                               )
L.L. BEAN, Inc.,               )
                               )
              Defendants.      )
_____)


               TRANSCRIPT OF EXCERPT FROM TRIAL
            BEFORE THE HONORABLE J. KELLEY ARNOLD
                UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:        MARGARET M. BOYLE
                          JEFFERSON COULTER
                          JULIE WIEDIGER
                          AXIOS Law Group, PLLC
                          1725 Westlake Avenue North, Suite 150
                          Seattle, Washington  98109

For the Defendant:        BRADLEY ALAN MAXA
                          Gordon Thomas Honeywell Malanca
                            Peterson & Daheim
                          1201 Pacific Avenue, Suite 2100
                          P.O. Box 1157
                          Tacoma, Washington  98401

                          PETER J. BRANN
                          Brann & Isaacson LLP
                          P.O. Box 3070
                          Lewiston, Maine  04243-3070

Court Reporter:           Julaine V. Ryen
                          Post Office Box 885
                          Tacoma, Washington 98401-0885
                          (253) 882-3832

Proceedings recorded by mechanical stenography, transcript
produced by Reporter on computer.
```

```
 1                *    *    *    *    *
 2          THE COURT:  Mr. Brann, did you tell the clerk you had
 3   something to take up outside the presence of the jury?
 4          MR. BRANN:  Yes.
 5          THE COURT:  Ladies and gentlemen, we will let you go
 6   now until 9:00 o'clock in the morning.  Have a pleasant
 7   evening.
 8       (Jury excused; 4:10 p.m.)
 9          THE COURT:  Mr. Brann.
10          MR. BRANN:  Thank you, Your Honor.
11      At this time we would move for judgment as a matter of law
12   using, I guess, the correct terminology.
13      I think that the evidence in this case, I may not -- the
14   case got to trial over summary judgment on the promise or the
15   hope that there would be evidence to support some theory here
16   that there was trade dress infringement.  I would submit on
17   certainly two of the three criteria for a trade dress case
18   there is nothing that gets over, you know, just total
19   speculation to create, to satisfy that requirement.
20      With regard to secondary means, there's nothing in this
21   record.  Mr. Grabijas was very clear, conceding, as he must,
22   that nobody really knew who the company was, no one knew who
23   the product was, that they were an infantile brand.
24      There's a little bit of marketing.  What marketing there
25   was, was directed 100 percent, as best the evidence looks,
```

1 towards the functionality. It wasn't directed towards this is
2 a new cool design or any of the rest of it, which is needed in
3 the cases coming out of the Ninth Circuit where they talk
4 about, you know, with a certain amount of advertising or with
5 a product that's been out for some period of time. The
6 advertising has to be directing you toward those design
7 elements. You can't just say we have a cool product from the
8 picture. The actual advertising has to do it. But it doesn't
9 matter because there is nothing to support it. There's
10 nothing to say it was even significant in any respect.
11 　　So as I hear, the only thing they are left with on the
12 second -- on the issue of the secondary meaning has to do with
13 this claim that L.L. Bean copied this vest, which there is --
14 and there's nothing other than speculation on that. And that
15 can't, after the Wal-Mart case, can't be enough.
16 　　Wal-Mart took the product and said -- and shipped it to
17 the Orient and they said, make us these things. And, you
18 know, they tried to copy it, and the Supreme Court said that
19 that wasn't enough.
20 　　So even if they could come up with something, it has to be
21 something other than just speculation that they copied this
22 thing. Especially when they adamantly deny it. We now have
23 the 337 pages of design documents. We've had the designer
24 talk about all of the things that he did and why he did them
25 in this regard.

1    I'd say on the secondary meaning, there's not a scintilla
2 of evidence to support that this pack is recognizable to the
3 consuming public.  Nothing.
4    Skipping over functionality.  I think for virtue of this
5 motion, I don't think we need to go there if they lose on the
6 merits, but I'm not sure what actually meets the standard.
7    But with regard to the last one, customer confusion.  They
8 have absolutely nothing on that.  There's not any evidence
9 whatsoever.  They are sold in different places.  You can't buy
10 them in the same place.  Both of the witnesses on behalf of
11 Mother say within ten feet you can tell that this thing is,
12 the source of it is L.L. Bean.
13    The standard isn't like, gees, I wonder if that's been
14 sourced to somebody?  You have to say, I looked at that and
15 I'm confused.  I think that that is something other than an
16 L.L. Bean.  It says L.L. Bean on it.  You can tell it within
17 ten feet.
18    There's no survey.  I mean, the hallmarks of every single
19 case that I think I've read having to do with the trade dress
20 is on customer confusion.  Survey evidence; notta.  On actual
21 confusion; notta.  What you have is, gees, I put some postings
22 out trying to hunt for some evidence and no one bothered to
23 write back.  There's absolutely nothing on that.
24    And indeed, on that one, the jury instructions that the
25 court has are even clearer on this inference of the copying,

1  is that you have to be -- you know, you are going to have to
2  have more than just inference of copying, but it's copying
3  with the intent to trade on the name, and it is the purpose of
4  the copying, and that's what they would need.  And you can't
5  just go in and say like, well, we think they look a lot alike,
6  and therefore they must have copied.
7      That would mean every single trade dress case, that its
8  owner could stand up and say, when I hold the two packs
9  together and they think at some distance -- and I would point
10 out that no witness was able to say these are the nine
11 elements of the trade dress, at least certainly without
12 prompting going through them.  These are the elements.  I
13 mean, they keep changing the stories.  They don't even know
14 what the trade dress is.
15     There's no consumer that is likely to be confused that
16 when they go to the www.llbean.com and they buy a pack that
17 says L.L. Bean on it, that says the new Bean pack, they are
18 getting anything other than L.L. Bean.  If they go to the
19 hunting and fishing store in Freeport, Maine, walk in past the
20 stuffed bears and the fish and you say, I want to buy one of
21 these things, that you're buying anything other than an L.L.
22 Bean product.  And on the Website, which appears on every
23 single page, it tells you what it is and again clearly
24 identifies those.
25     There's zero, notta, evidence on customer confusion.  Two

1  of the three, I submit they don't have enough to get beyond a
2  motion at this stage, and I would ask the court to grant our
3  motion.
4          THE COURT:  Thank you.
5      Who's going to argue for the plaintiff?
6          MS. BOYLE:  I will argue it.
7      The standard for a directed verdict is the same as on
8  summary judgment, and I think that the court has heard
9  sufficient evidence, and essentially all the evidence that we
10 presented to the court in our motion for summary judgment and
11 again in testimony during the trial.  I think that counsel is
12 arguing what he thinks the evidence means.  I think that if
13 this court were to consider the circumstantial evidence and
14 direct evidence that Mother has elicited from the stand on
15 these issues, I think that there's sufficient evidence to
16 raise an issue of fact as to every single issue, every single
17 element of trade dress, as well as the state claims, to allow
18 this case to go to the jury.
19     While you're considering the testimony that was provided,
20 Your Honor, of course, the jury's not going to be getting
21 instructions fully elaborating upon the Ninth Circuit standard
22 for customer confusion and the significance that it holds with
23 the Ninth Circuit, and I'm not meaning to reargue that point
24 with the court, but I do think that for purposes of the
25 directed verdict, this court can use the standard of the Ninth

1  Circuit, which is evidence of copying is strong evidence of
2  secondary meaning.  It's strong evidence of nonfunctionality.
3  And I think that there's, there's absolutely strong
4  circumstantial evidence that was provided by the testimony of
5  Mr. Heisler and Mr. Murray that this pack was copied by them
6  intentionally.
7      So I think that in regards to factors that counsel pointed
8  out, I think that we have met our standard.  And I know that
9  the testimony of Mr. Grabijas was a bit lengthy.  I think that
10 some of the punch of the argument that we would make in
11 closing were deflated a bit because his points were lost in,
12 in some answers that got a bit too long.
13     But that doesn't negate the testimony that was there, that
14 he had a strong market presence.  And much of the advertising
15 that was done in this case was done for free.  So while L.L.
16 Bean and Mr. Brann tried to argue that Mother had this small
17 marketing budget, it's ignoring the fact that in this
18 industry, in this particular industry, unlike a lot of other
19 industries, the advertisement is free.
20     And I can't imagine that this court isn't cognizant that
21 if somebody goes and Googles "upland vest pack" or an "upland
22 hunting vest" that Mr. Grabijas's Mother isn't going to come
23 up in probably the first three pages.  Because Orvis is going
24 to come up, Cabelas is going to come up, L.L. Bean is going to
25 come up.  All these places that are carrying his product are

1  going to come up, and that's what consumers are going to be
2  looking at.
3       So this isn't an industry where Mr. Grabijas has to do a
4  lot of paid advertisement.  It's not an industry where he's
5  going to have to do paid commercials.  He essentially is
6  reaching his target audience for free, the upland hunter, and
7  I think that the market saturation that was testified to,
8  albeit I agree somewhat disjointedly, it's clear that Mother
9  had a huge market presence.
10      I think that the last points that were made by Mr. Murray
11 regarding the contents of the product point to that.  Not only
12 does Mr. Murray send a message to the jury that he recognized
13 Mother's market presence in his comments that Mother had
14 captured the attention of the hunting media, he also said he
15 had captured the attention of the customers.  That shows
16 customer awareness.
17      And in addition, he says that the sales of Mother
18 motivated them in part to produce their competing product.
19 Again, I think that that shows that they're trying to get into
20 the same market as Mother, and that shows market presence.
21      So I agree, secondary meaning can be difficult, and I do
22 wish that the court would reconsider the instructions that we
23 had offered regarding how paramount to the consideration proof
24 of copying is.
25      But I do think that there is sufficient evidence of

1  secondary meaning to get us to the jury.  I also agree -- I
2  also submit that there is sufficient evidence of
3  nonfunctionality to get us to the jury.  There's absolutely no
4  evidence of genericness.  Every single witness testified that
5  this is not a generic product.
6      So I do think that as to those three elements, there's
7  sufficient evidence.
8      Likelihood of confusion.  Mr. Brann is trying to treat
9  that as it requires actual confusion.  Unfortunately, I wasn't
10 in the court, but I do understand that even some testimony as
11 to actual confusion came out on cross-examination.  It's
12 probably not strong evidence, but it is there, it was said.
13     But in regards to proving likelihood of confusion, I think
14 that we have got sufficient evidence before the court to
15 support a finding, at a minimum, that there's an issue of fact
16 that needs to be resolved by the jury as to whether or not
17 there's a likelihood that two upland bird hunters looking for
18 a new pack to hunt with would be confused when looking at
19 those two products.
20     I think the court heard from Jesse Thompson that simply
21 because it says L.L. Bean doesn't negate the whole trade
22 dress, and that somebody looking at the L.L. Bean product who
23 was, who had also looked at the Mother product would think
24 those two came from the same source.  In other words, it
25 probably would only further confuse the customer because now

1  the customer doesn't know, does Bean make Mother?  Does Mother
2  make Bean?  Or does somebody else make them both?  But they
3  both look like they are made by the same parent.  They are
4  both in the same family.
5      So the presence of the logo does not negate that there's a
6  high likelihood that two people -- or that a customer looking
7  at those two packs could be confused as to the source.
8      I would also like to remind the court that it is not --
9  the standard isn't that looking at the product the consumer
10 has to know that it's a Mother product.  It's simply that the
11 consumer looking at the product would think to themselves,
12 that's distinctive and that's made by somebody.  Somebody took
13 care to make that product.  It's from the particular source.
14 And I think we have met that, Your Honor.
15     Thank you.
16         THE COURT:  Thank you.
17     You have the last shot, Mr. Brann.
18         MR. BRANN:  I would like to go to the last point
19 first.  That is absolutely not the standard for trade dress.
20 You have to -- the trade dress, the Coca-Cola is the product.
21 You have to know the source of the product from looking at it.
22 The trade dress has to tell you the source.  Not like that's
23 kind of interesting, maybe I ought to go do some research on
24 it and figure out what the source is.  Trade dress has to tell
25 you what the product is.

1  And when you look at the L.L. Bean product, you are not
2  confused that it is somebody else's product. It has its name
3  on it, and there's nothing to suggest that -- there's no, no
4  likelihood of confusion in that regard.
5  With regard to the first point -- and furthermore, the
6  Ninth Circuit case that Ms. Boyle is referring to is not the
7  law anymore. It predates. The case they are citing, 1985,
8  predates the Wal-Mart case. A case of direct copying. They
9  send it over, copy this, and they said that's not enough to
10 have a secondary meaning. You can't draw an inference.
11 And indeed, the very case they are citing says if you have
12 evidence of actual copying, with no contrary evidence, you
13 could, prior to Wal-Mart, draw an inference. Not present
14 here.
15 We have Mr. Heisler and Mr. Murray go on at great length
16 with lots of contrary evidence, and obviously deny the fact
17 they are copying it.
18 The only thing they are left with is we can hold the two
19 packs together. There's no evidence to suggest that anyone
20 recognized that product that says that's a Mother.
21 The last point I would like to make is with regard --
22 which is sort of the unspoken tail on this particular dog,
23 which is the state claim. I don't see that the plaintiff made
24 any attempt to put in anything to satisfy the standards, the
25 specific standards for the state claim in order to show, for

1  example, the effect on public interest.  Obviously, if they
2  lose the trade dress, the whole thing is moot, but with
3  respect to the specific standards for the Washington case, you
4  know, Washington State statute, I don't think there's anything
5  there.
6      So even if the court thought, and obviously we feel quite
7  strongly that they do not meet two of the three standards, two
8  of the three elements for trade dress.  They don't -- the
9  state claim should go by the way.
10     Thank you.
11         THE COURT:  Well, let me say that, of course, when
12 the court rules on a summary judgment the court either grants
13 it or denies it, sometimes with more and sometimes with less
14 commentary.
15     My policy is not simply to grant or deny a summary
16 judgment without comment because I don't think that's fair to
17 the parties.  But the trap, of course, some judges will tell
18 you, don't say too much.  I have never followed it.  I have
19 always decided not to fall into that trap.  I would err the
20 other way and take the heat.
21     This was a very, very difficult case on summary judgment
22 for the court, and at the time, I wished -- I even commented
23 to my staff, I wish I had the product in front of me, not
24 pictures, but the product, because I thought it would make a
25 lot more sense to me.

1    I thought it was close on literally every element.  I
2 allowed the case to move forward and have it presented to the
3 jury, and the court needs to be very sensitive to the fact
4 that the judge is not the jury.  It is not the judge's role to
5 be a fact finder.  As I so carefully told the jurors, I would
6 not mess in their sandbox, so to speak, on the facts if they
7 would not mess in my sandbox as to what the law is.
8    The amendment to the federal statute, the Wal-Mart case,
9 all, I think, make this difficult from a legal standpoint, and
10 there's a lot of law that has been cited -- and no one side
11 has a corner on the market of citing some older case law, but
12 that's okay, too.  You have to bring to the court what you can
13 to support your position.
14    At the esoteric level, my perception is that Mr. Grabijas
15 is a very, very passionate and sincere individual who had an
16 idea that he wanted to run with, and he did run with it, and
17 he developed it and it was a good product.  That is clear.
18    One thing that is clearer to me now, although one might
19 argue that I had all the information before, but after
20 listening to the testimony very carefully yesterday from the
21 plaintiff, he was very candid about his advertising, which I
22 guess spoke for itself.  Of course he didn't have the
23 foresight to know what was going to happen, that he was going
24 to end up in litigation, but he couldn't have shot himself in
25 the foot any more, in hindsight, than he did by emphasizing

1  the function over form over and over and over in his
2  advertising, and then going one step further and saying it's
3  not for the fashionista.  But then he comes to court and says,
4  well, that's just marketing strategy.  You're not really
5  truthful with the consumer.  And that's in essence what he
6  said in response to a very specific question.
7     I don't mean to say that he said we lie to the customer.
8  There are many shades of gray, and a large arena in between
9  what we might call the absolute truth and falsehood.
10    But nonetheless, the evidence cannot be what was in his
11 mind because what was in his mind cannot confuse other people,
12 cannot rise to the level of trade dress, and cannot overcome
13 this issue of functionality.
14    On the issue of customer confusion.  At the time of the
15 motion for summary judgment, I felt that with what I had in
16 front of me that circumstantially it might be there.  But to
17 say in response to a motion for a directed verdict or judgment
18 at this point that, well, the court knows that you can Google
19 and you might get confused.  Well, the court does know that
20 you can Google -- the court has Googled -- but there's no
21 evidence before the jury that somebody can get confused in
22 that fashion.  Certainly not sufficient evidence for them to
23 make that determination.
24    I'm satisfied that without invading the province of the
25 jury -- and let me say one other thing.

1  I was shocked when I saw the products. To my naked eye --
2  and I'm not an upland duck hunter -- they don't look very much
3  alike. I expected much more in the way of similarity. The
4  bungee cord is such a distinguishing feature from the front
5  that it's almost a distraction in terms of any similarity.
6  When you look beyond that, you can see some of the points,
7  some of the similarities. But there is so much distinction
8  that has been testified to and not contradicted in terms of
9  what Bean did to change or add in terms of function -- and I
10 realize that it's not about function, according to plaintiff,
11 it's about design. But that's not what the plaintiff says in
12 his ads, and when he says it really was something else other
13 than what was in his mind, there's no evidence of that.
14 Having said all that, I am going to grant the defendant's
15 motion.
16       MS. BOYLE:  Thank you, Your Honor.
17       THE COURT:  The court will be at recess.
18       THE CLERK:  Please rise.
19  (Recessed at 4:30 p.m.)
20
21
22                C E R T I F I C A T E
     I certify that the foregoing is a correct transcript from
23 the record of proceedings in the above-entitled matter.
24
   /s/  Julaine V. Ryen                October 3, 2007
25      JULAINE V. RYEN                      Date